# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

LEANN ROSSI, THERESA          :
MCGRUDER, ANSLEY PASCOLI,     :
DEBRA POOLE, CHERYL SMALLS,   :
and REBECCA CANADA,           :
                              :     **CIVIL ACTION FILE**
              Plaintiffs,     :     **NO. 1:10-CV-4254-RWS-AJB**
                              :
         v.                   :
                              :
FULTON COUNTY, GEORGIA,       :
                              :
              Defendant.      :

## UNITED STATES MAGISTRATE JUDGE'S ORDER AND
## NON-FINAL REPORT AND RECOMMENDATION

In this action, Plaintiff Leann Rossi raises employment-discrimination claims against Defendant Fulton County, Georgia, under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Am. Compl. [Doc. 16]). Presently before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Leann Rossi. [Doc. 158]. For the reasons set forth below, the undersigned **RECOMMENDS** that the motion be **GRANTED IN PART and DENIED IN PART**.

## I. Background

As required when considering a motion for summary judgment, the Court has viewed the evidence and reasonable factual inferences in the light most favorable to Plaintiff, the nonmoving party.[1] *See United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). To the extent that material facts are in dispute, the Court has resolved the disputes in Plaintiff's favor.[2] *See Vaughan v. Cox*, 343 F.3d 1323, 1326 n.1 (11th Cir. 2003). The Court does not, however, accept legal

---

[1] Paragraph numbers preceded by "D" refer to Defendant's Statement of Material Facts, as to Plaintiff Leann Rossi, to Which There Are No Genuine Issues To Be Tried, filed in support of its motion for summary judgment, [Doc. 158-2], and paragraph numbers preceded by "P" refer to Plaintiff Leann Rossi's Statement of Material Facts Which Present a Genuine Issue for Trial, [Doc. 204-3], filed in opposition to Defendant's motion for summary judgment. Plaintiff's and Defendant's responses to the statements of material fact will be designated as "P. Resp.," [Doc. 204-2], and "D. Resp.," [Doc. 224-1], respectively.

[2] The Court notes that for the purposes of resolving a motion for summary judgment, "facts" may not be considered unless they are unopposed or supported by citations to admissible evidence. *See* Fed. R. Civ. P. 56(c); N.D. Ga. R. 56.1(B). For this reason, when the opposing party has pointed out that the evidence cited to support a factual statement is unsupportive, the Court has edited the fact to recite only the portion supported by the evidence, and in cases in which the citation is absent or unsupportive, the Court has omitted the statement of fact entirely. (*See, e.g.*, P ¶¶ 34, 43, 45, 51-54, 57, 71; D ¶¶ 137, 144).

2

conclusions, masquerading as facts, as true.[3] *See Day v. Taylor*, 400 F.3d 1272, 1277 (11th Cir. 2005). The facts of the case, for the purpose of adjudicating Defendant's motion for summary judgment, are therefore as follows.[4]

Plaintiff is a white female and was born on May 21, 1966. (D ¶¶ 18-19; P. Resp. ¶¶ 18-19). She became employed with Defendant on January 3, 2001, and continues to work for Defendant. (P ¶ 65; D. Resp. ¶ 65; D ¶ 20; P. Resp. ¶ 20).

Plaintiff was diagnosed as being bipolar in 2001. (P ¶ 12; D. Resp. ¶ 12). Her bipolar symptoms have included insomnia, depression, manic episodes, mood swings, lack of concentration, rapid thoughts, and loud speaking. (D ¶ 64; P. Resp. ¶ 64). Plaintiff's treatment for bipolar has included in-facility treatment, medication, group therapy, and weekly psychotherapy sessions. (D ¶ 65; P. Resp. ¶ 65). During a manic episode or flare-up, Plaintiff could be disruptive and have a hard time focusing. (D ¶ 66; P. Resp. ¶ 66). She has had paranoid episodes when she was not taking her

---

[3] Accordingly, the Court has disregarded statements of material fact or portions thereof that state legal conclusions. (*See, e.g.*, P ¶¶ 37-39, 42, 46, 48, 62, 69; D ¶ 77).

[4] The facts recited in this section are intended to establish the context of the case. Additional facts pertinent to the parties' arguments will also be recited in the discussion section below. Statements of fact that have no apparent materiality and are not referenced in the parties' arguments have not been included. *Cf. Ward v. United States*, 154 F.R.D. 291, 293 (M.D. Fla. 1994) (refusing to supply argument for party).

AO 72A
(Rev.8/8
2)

bipolar medication, and when she takes her bipolar medication, her paranoid episodes manifest as fear. (D ¶¶ 67-68; P. Resp. ¶¶ 67-68). Medication does not alleviate all of her bipolar symptoms, and she has flare-ups just before her menstrual cycle. (D ¶ 70; P. Resp. ¶ 70). Stressful events lead to flare-ups, which sometimes affect Plaintiff's ability to work. (P ¶ 16; D. Resp. ¶ 16).

Plaintiff served in a temporary hourly position as a Data Collector from January 3, 2001, until she resigned from the temporary Data Collector position on May 21, 2002, and was hired as a Residential Property Appraiser on June 5, 2002. (D ¶¶ 21-22, 78-79; P. Resp. ¶¶ 21-22, 78-79). As a Property Appraiser, Plaintiff reviews parcels for tax assessment purposes and reviews property record cards, properties based on sales, and properties based on appeals. (D ¶ 23; P. Resp. ¶ 23). At first, Plaintiff was assigned to the 17th District, which is the district that surrounds Atlanta. (D ¶¶ 24-25; P. Resp. ¶¶ 24-25). In 2004, she was reassigned to the 14th District. (D ¶ 26; P. Resp. ¶ 26). When assigned to the 14th or the 17th District, Appraisers work out of the downtown office located at 141 Pryor Street in Atlanta, Georgia. (D ¶ 27; P. Resp. ¶ 27).

In 2006, a new Board of Assessors was appointed and hired Burt Manning as Chief Appraiser and Tony George as Assistant Chief Appraiser. (D ¶ 4; P. Resp. ¶ 4).

4

Manning served in his position until February 2012, and George served in his until April 2010. (D ¶¶ 32, 36; P. Resp. ¶¶ 32, 36). As Chief Appraiser, Manning was the final decisionmaker, had overall responsibility for the Tax Assessor's Office, and oversaw the Assistant Chief Appraiser. (D ¶¶ 8-9, 33-34; P. Resp. ¶¶ 8-9, 33-34). As Assistant Chief Appraiser, George was responsible for the day-to-day operations of the Tax Assessor's Office, including successfully preparing the annual tax digest and efficiently and effectively handling appeals for Fulton County. (D ¶¶ 10, 37-38; P. Resp. ¶¶ 10, 37-38). Douglas Kirkpatrick became employed with Fulton County on November 18, 2008, and has served as Deputy Chief Appraiser since then. (D ¶¶ 39-41; P. Resp. ¶¶ 39-41). As Deputy Chief Appraiser, Kirkpatrick is responsible for the day-to-day operations of the residential division of the Fulton County Tax Assessor's Office. (D ¶ 42; P. Resp. ¶ 42). Theresa McGruder was Plaintiff's manager. (D ¶ 131; P. Resp. ¶ 131).

George's management style is described as abrasive, direct, stern, strict, heavy-handed, harsh and dictatorial, and many employees—both male and female—disapproved of it. (D ¶¶ 12-13; P. Resp. ¶¶ 12-13). It was not unusual for an employee to report to Manning that George was rude to them or belittled them. (D ¶ 14; P. Resp. ¶ 14). George also often wrote up employees based on grounds that

AO 72A
(Rev.8/8
2)

Manning found lacking. (P ¶ 48; D. Resp. ¶ 48; Deposition of Burton Manning, Jr., ("Manning Dep.") [Doc. 230] at 66-67). George commonly treated black male employees respectfully and ignored white female employees like Plaintiff. (P ¶ 33; D. Resp. ¶ 33).

In 2007, George gave black employees tools to perform their jobs. (D ¶ 126; P. Resp. ¶ 126). Rhonda Augustine, James White, Tara Parker, Bridget Conyers, Eric Fields, and Zachery Mitchell each received an appraisal book, a new camera, and/or a calculator. (P ¶¶ 18, 21, 23; D. Resp. ¶¶ 18, 21, 23; D ¶ 127; P. Resp. ¶ 127). Although she already had an old camera, a calculator, and an old appraisal book, Plaintiff requested new tools. (D ¶¶ 128-29; P. Resp. ¶¶ 128-29). In particular, she wanted a new camera because the new cameras had video capability and her old one "often" did not work. (P ¶ 26; D. Resp. ¶ 26; P. Resp. ¶ 129). George said that he did not have any more to give her. (P ¶ 24; D. Resp. ¶ 24). After Plaintiff complained to George that she did not receive the tools he gave the other employees, George ignored her. (P ¶ 28; D. Resp. ¶ 28). To date, Plaintiff has not received a new appraisal book or a new calculator. (P ¶¶ 20, 22; D. Resp. ¶¶ 20, 22).

In February 2008, George forwarded an e-mail to the entire staff notifying them that the Board of Equalization would no longer be doing telephone hearings except for

6

hearings involving the elderly or disabled. (P ¶ 34; D. Resp. ¶ 34; D ¶¶ 137-38; P. Resp. ¶¶ 137-38; Deposition of Leann Rossi ("Pl. Dep."), Exh. 5 [Doc. 195-1 at 159-64]). Further down in the e-mail chain was a taxpayer letter chastising Plaintiff. (P ¶ 34; D. Resp. ¶ 34; D ¶ 137; P. Resp. ¶ 137; Pl. Dep., Exh. 5 [Doc. 195-1 at 159-64]). Plaintiff was humiliated and embarrassed that the taxpayer letter had been forwarded to the entire staff. (P ¶ 34; D. Resp. ¶ 34).

In or around the summer of 2008, Plaintiff submitted the requisite FMLA paperwork to the proper employee, Darlene Davis, stating that Plaintiff needed to leave work at 3:00 p.m. on Mondays for medical appointments in connection with her disability. (P ¶ 35; D. Resp. ¶ 35). Around the same time, George announced a policy that any employee leaving work early would need his permission. (P ¶ 36; D. Resp. ¶ 36). Despite the fact that Davis and Defendant's human resources department had the FMLA forms from Plaintiff, Davis instructed Plaintiff to see George about her request. (P ¶ 37; D. Resp. ¶ 37). When Plaintiff went to George's office, he closed the door, and with another employee present (Jacqueline Dennis[5]), he told Plaintiff that he would not approve the leave unless Plaintiff told him the reason

---

[5] Jacqueline Dennis is also referred to as Jacqueline Davis in some of the filings. To distinguish her from Darlene Davis, the Court will refer to her as "Dennis."

AO 72A
(Rev.8/8
2)

for the therapy. (P ¶ 39; D. Resp. ¶ 39; D ¶ 72; P. Resp. ¶ 72; Pl. Dep. at 71). Plaintiff was granted the FMLA leave at that time and every time thereafter that she requested it. (D ¶ 141; P. Resp. ¶ 141).

In October 2008, Plaintiff was again insulted and humiliated when George failed to acknowledge her suggestions and input during a discussion in a departmental meeting. (P ¶ 41; D. Resp. ¶ 41). As Plaintiff was leaving the meeting, George proclaimed to the group, "There goes a prime example of institutionalized behavior." (P ¶ 42; D. Resp. ¶ 42). Thereafter, George recommended Plaintiff's termination on the grounds that she had become disruptive during the meeting, (D ¶ 144; P. Resp. ¶ 144; Pl. Dep., Exh. 9 [Doc. 195-1 at 180]), and Plaintiff wrote two e-mails to Manning in which she complained about George's behavior, (P ¶ 43; D. Resp. ¶ 43). At about the same time, Plaintiff filed an internal grievance in which she stated that "Tony George was disrespectful and verbally abusive and made derogatory remarks pertaining to the manner in which I perform my job. He dismissed my attempt to make suggestions during a department meeting and displayed the same behavior towards my manager and co-workers during this meeting." (P ¶ 44; D. Resp. ¶ 44; D ¶ 145; P. Resp. ¶ 145; Pl. Dep., Exh. 8 [Doc. 195-1 at 178]). Plaintiff requested "[a] written apology for his current actions and behavior, and the protection of Fulton

8

County that he may not retaliate as he had done in similar situations." (Pl. Dep., Exh. 8 [Doc. 195-1 at 178]). The grievance was later resolved within the department, after Manning talked with Plaintiff. (P ¶ 45; D. Resp. ¶ 45; D ¶ 148; P. Resp. ¶ 148). Plaintiff's understanding from her conversation with Manning was that if she did not withdraw the grievance she would be suspended for two weeks for insubordination based on what George had written up. (P ¶ 45; D. Resp. ¶ 45; Pl. Dep. at 82).

In early 2009, the office began to receive property valuation appeals from 2008. (P ¶ 46; D. Resp. ¶ 46; Pl. Dep., Exh. 3 [Doc. 195-1 at 18]). Although the appeals should have been part of Plaintiff's responsibilities, George completed and closed the appeals out himself and did not allow Plaintiff to do any work on them. (P ¶ 46; D. Resp. ¶ 46; D ¶ 150; P. Resp. ¶ 150; Pl. Dep., Exh. 3 [Doc. 195-1 at 18]).

At 7:15 on the morning of June 16, 2009, a person Plaintiff believes was Orlando Allen, a temporary Data Collector and an old friend of George, was standing outside of the building when Plaintiff arrived at work. (P ¶ 47; D. Resp. ¶ 47; D ¶¶ 153, 175; P. Resp. ¶¶ 153, 175). The person was wearing sunglasses and a white fedora in what appeared to Plaintiff to be an attempt to disguise himself. (D ¶ 154; P. Resp. ¶ 154). He stared at Plaintiff and looked suspicious. (P ¶ 47; D. Resp. ¶ 47; D ¶ 153; P. Resp. ¶ 153). Plaintiff believed that Allen was stalking her at George's

behest and became fearful.  (P ¶ 55; D. Resp. ¶ 55; D ¶¶ 156-57; P. Resp. ¶¶ 156-57).

The person did not follow her into the building.  (D ¶ 158; P. Resp. ¶ 158).

After Plaintiff went into the building, she reported the incident to Kevin Maxey, who was Allen's supervisor, Darlene Davis,[6] and McGruder.  (D ¶¶ 162, 165; P. Resp. ¶¶ 162, 165).  She told Maxey she thought Allen was following her. (P ¶ 56; D. Resp. ¶ 56).  Maxey states that Plaintiff came to his office frantic and stated that Maxey needed to do something about one of his employees because Allen was out in the parking lot stalking her.  (D ¶ 166; P. Resp. ¶ 166).  Maxey told her to file a grievance, and Davis told Plaintiff she would look into it.  (D ¶¶ 163-64; P. Resp. ¶¶ 163-64).  Maxey also states that Plaintiff became belligerent and he asked her to leave his office.  (D ¶ 167; P. Resp. ¶ 167).  Maxey then wrote a letter of insubordination memorializing his interaction with Plaintiff. (D ¶ 168; P. Resp. ¶ 168). Plaintiff returned to her car alone and moved it to another location. (D ¶ 170; P. Resp. ¶ 170).  The next day, Maxey wanted to meet with Plaintiff and Allen in the human resources office, but Plaintiff told Maxey she was uncomfortable

---

[6]     Although neither Plaintiff nor Defendant explains the scope of Davis's responsibilities, it appears that she works in Defendant's human resources department. (*See, e.g.*, P ¶¶ 35, 37; D. Resp. ¶¶ 35, 37 (stating that Davis handled the paperwork for a leave request and worked with FMLA forms)).

AO 72A
(Rev.8/8
2)

being around Allen. (P ¶ 57; D. Resp. ¶ 57; Pl. Dep., Exh. 3 [Doc. 195-1 at 18]). Instead she went out into the field that day. (D ¶ 171; P. Resp. ¶ 171). She did not attend the meeting held to discuss the incident. (D ¶ 176; P. Resp. ¶ 176).

On June 18, 2009, Plaintiff filed a police report with the Fulton County Police Department and alleged that she felt threatened and was being watched by person she suspected—but was not certain—was Allen. (D ¶¶ 173, 175; P. Resp. ¶¶ 173, 175). She filed the report because she believed the incident might have been a form of retaliation for an earlier grievance filed before Allen worked for Fulton County. (D ¶ 174; P. Resp. ¶ 174). On June 19, 2009, Maxey wrote a memorandum to Kirkpatrick in which he stated that Plaintiff had confronted him about her suspicions about Allen and had acted in an aggressive, offensive, and insubordinate manner. (D ¶ 177; P. Resp. ¶ 177; Pl. Dep., Exh. 11 [Doc. 195-1 at 184]). Kirkpatrick investigated, and when he asked Plaintiff if she had in fact filed a police report, she told him she did. (P ¶ 59; D. Resp. ¶ 59; D ¶ 178; P. Resp. ¶ 178; Pl. Dep., Exh. 3 [Doc. 195-1 at 18]). Kirkpatrick then directed McGruder to issue a written warning to Plaintiff. (D ¶ 178; P. Resp. ¶ 178). Plaintiff was written up for insubordination. (P ¶ 59; D. Resp. ¶ 59). Plaintiff denies having been offensive or insubordinate. (P ¶ 60; D. Resp. ¶ 60).

AO 72A
(Rev.8/8
2)

Plaintiff told Kirkpatrick that she was concerned about leaving the building, (D ¶ 179; P. Resp. ¶ 179), and requested that other employees be allowed to escort her into the building during her shift, (D ¶ 182; P. Resp. ¶ 182). On June 22, 2009, Kirkpatrick changed Plaintiff's shift hours from 7:30 a.m. through 4:00 p.m. to 8:30 a.m. through 5:00 p.m. and suspended her field activities to address Plaintiff's safety concerns. (D ¶¶ 180-81; P. Resp. ¶¶ 180-81). He denied her request for an escort, however, telling Plaintiff that he could not be responsible and that it was not within the other employees' duties. (Pl. Dep. at 125). Days later, Kirkpatrick reassigned Plaintiff to the North Region, where she currently serves. (P ¶ 65; D. Resp. ¶ 65; D ¶¶ 28, 184-85; P. Resp. ¶¶ 28, 184-85). When assigned to the North Region, Appraisers work out of the office located at 3155 Royal Drive, in Alpharetta, Georgia. (D ¶ 29; P. Resp. ¶ 29). The transfer from downtown Atlanta to Alpharetta increased Plaintiff's four-mile round-trip commute to sixty miles, round trip. (P ¶ 71; D. Resp. ¶ 71; Pl. Dep. at 181). She did not lose any benefits or pay. (D ¶ 75; P. Resp. ¶ 75).

12

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 5, 2009.[7]  (D ¶ 188; P. Resp. ¶ 188). In the section of the form indicating the cause of the alleged discrimination, Plaintiff checked the boxes marked "race," "color," "sex," "retaliation," "age," and "disability." (Pl. Dep. Exh. 3 [Doc. 195-1 at 16]).  She indicated that the discrimination started in 2007 with the last date of discrimination occurring in June 2009.  *Id*.  She also checked the box marked "continuing action."  *Id*.  The particulars of Plaintiff's charge were as follows:

> I am a white female over the age of forty with a disability.  I have worked in the Fulton County Tax Assessor's Office as a Property Appraiser since 2001 at the Downtown Atlanta office.  In June of 2009 I suddenly received notice of my transfer to the Alpharetta, Georgia office without warning, notice or discussion, after I had made several complaints about discriminatory treatment I had suffered by management.

> A new management regime came about in 2006 – Burt Manning (white male), who serves as Chief Appraiser, and Tony George (black male), the Assistant Chief Appraiser, took over.  At this time older employees began being forced out as this new regime settled in.

> Over a span of several months in 2007 a disparate treatment of white employees began to surface.  Several times Mr. George (black male) came down to the floor I worked on and gave black employees tools to perform their jobs – like calculators, cameras and appraisal books, while

---

[7]  The EEOC assigned the matter Charge No. 410-2009-05204. (D ¶ 188; P. Resp. ¶ 188).

white employees were not given these items. I then sent an email to Mr. George asking for these tools that the black employees were getting. After I sent the email Mr. George began to ignore me. He would stop and talk to black employees but not to me, unless I went out of my way to stop him as he passed me. Otherwise, he would just walk right by. I finally did receive a camera, however, I never received the HP calculator or an IAAO appraisal book.

In approximately late 2007 I had an issue with a taxpayer that needed resolution. Mr. George then sent an email finding fault with me to all tax appraisers working in the office. The email included dialog between my manager and me. The result was that Mr. George (black male) humiliated and embarrassed me in front of the entire workforce which is predominantly black. I asked for an apology and he refused, instead asking me if I believed in God and telling me it should not matter what other people think. No black employees, younger employees or male employees were treated this way and I believe this was retaliation for my previous complaint regarding tools and equal treatment for black employees.

I have ongoing medical appointments that required FMLA approval. In approximately September of 2008 Mr. George required that I come to his office and in front of him and his assistant, state the exact medical reason that caused me to attend medical appointments. This was despite the fact that we had a human resources coordinator who handled these issues and had all of the required information. I am aware of no other black employee, younger employee, male employee or non-disabled employee that was forced to undergo such embarrassment, insult and humiliation and disclose their medical condition to Mr. George and his assistant for no reason whatsoever other than discriminatory reasons.

During a meeting with other employees on October 10, 2008 Mr. George became verbally abusive and made negative remarks about the manner in which I performed my job. I attempted to make suggestions during this departmental meeting and Mr. George ignored me. Mr.

14

George then recommended that I be terminated for insubordination. No black employees, younger employees, non-disabled employees or male employees were treated in such a manner and subjected to public humiliation, insult and embarrassment.

At this time I filed a Grievance with the department but the Chief Appraiser (Burt Manning) requested that I discontinue my Grievance in exchange for no pursuit of termination and/or discipline by the department. I believe this treatment is rank discrimination.

In early 2009 the property valuation appeals from 2008 were coming through our office and needed to be resolved as part of my duties. Mr. George took part of my responsibilities away by not allowing me to do any work with these appeals. I am aware of no black, male, non-disabled or younger employee who was treated this way.

In approximately March of 2009 Mr. George hired a temporary data collector named Orlando Allen (black male), who was a long-time personal friend of his. On the morning of June 16, 2009 when I arrived at work around 7:15 a.m. Mr. Allen was standing outside the building and watching me. This was especially peculiar since he usually arrives for work at 9:00 a.m. He was wearing sunglasses and a white fedora. When he realized I saw him he immediately turned around. He watched me enter the building. I then approached Mr. Allen's manager, Kevin Maxey (black male), and told him I thought Mr. Allen had been following me. The next day Mr. Maxey wanted to meet with Mr. Allen and me in the human resources office, but I was uncomfortable with being around Mr. Allen, as I told Mr. Maxey. I then filed a police report. Douglas Kirkpatrick (white male) then asked me if I had in fact filed a police report and I told him that I did. I was then written up for insubordination.

During this time I was also suspended from my daily field activities and told that my hours were changed from 7:30 a.m. – 4:00 p.m. to 8:30 a.m. – 5:00 p.m. for my "safety" in lieu of this reprimand. I requested from Mr. Kirkpatrick that I be afforded the benefit of an escort

15

into the building, as was afforded to at least one female black employee (Eisha) and Mr. Kirkpatrick said he would need to see written consent of an employee agreeing to escort me. I then excused myself and brought back signatures from two employees saying they would escort me into the building in the mornings. I then received an email from Mr. Kirkpatrick on June 24, 2009 which refused my request and said for the first time that I was being transferred. Previously a black female employee filed an incident of harassment against a temporary data collector (black male) and he was immediately terminated without question or investigation due to the fact that he was not a permanent employee.

I was notified that I was to be transferred from the Pryor Street (South) office to the Alpharetta (North) office effective July 8, 2009. Then another memo came out transferring me earlier, on June 29, 2009. At the same time Mr. Kirkpatrick transferred another white female from the North Office to the South office without any prior notice. I believe I was transferred as punishment for speaking out, complaining about being discriminated against in the office, expressing my concerns about a protégé of Tony George (black male) stalking me and filing a police report over the incident, and asking that I, a white female, be given the same tools and equipment to do my job as other, black employees. I further believe that no black, male, younger or non-disabled employee has been transferred to an office they did not desire in punishment for speaking out against discriminatory acts, and in retaliation for openly requesting that I be treated equally. My employer has tried to contend that my transfer was for safety reasons, but this excuse is merely a pretext for actual discrimination and retaliation against me. In the past only white people have been transferred against their will as punishment for speaking out about poor management and discrimination.

On July 27, 2009 I was advised by Shareka Davis (black female), an assistant to and possible relative of Darlene Davis (black female), who supervises human resources, that despite my start date of January 2001, as evidenced by my last performance evaluation, management is alleging my start date was not until June of 2002. In addition to being untrue, this

16

is causing a negative impact on the accrual of my vacation time. Changing my start date from January 2001 to June 2002 has cost me over 30 hours of vacation time discriminatorily. Such treatment has not been given to black, younger, male, non-disabled individuals in the department.

Over the span of nine years I have received "outstanding" employee evaluations during our mandatory quarterly review systems. As stated in the FCG pay plan and policies and procedures, this type of achievement would warrant annual increases, however, at no such time have I received such increases, despite my "outstanding" ratings. I continue to remain at the "bottom" of the C42 payband after almost ten years of employment. I was also promised a pay increase after completing a Graduate level certificate from an accredited college in my profession and upon completion I was refused an increase while others who also graduated received approximately a $5000 pay increase.

I believe I have been and continue to be discriminated and retaliated against due to my race, gender, disability and age in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act and the Americans with Disabilities Act and 42 USC § 1983.

(*Id*. at 16-19). Soon after Plaintiff filed her EEOC charge, Tim Brown, the North Region Appraisal Manager, gave Plaintiff a camera with video capability. (P ¶ 31; D. Resp. ¶ 31; D ¶ 57; P. Resp. ¶ 57).

In or about January and March 2010, Rossi applied for a promotion to Senior Appraiser. (P ¶ 74; D. Resp. ¶ 74). Plaintiff was interviewed for one of the two positions. (P ¶ 75; D. Resp. ¶ 75; Pl. Dep. at 162). Brian Gardner was selected for one

17

of the positions and Steven Hooker was selected for the other.  (P ¶ 76; D. Resp. ¶ 76).

Gardner and Hooker are both African-American males.  (P ¶ 76; D. Resp. ¶ 76).

On December 16, 2010, the EEOC issued a notice of right to sue in which it explained that it was terminating its processing of the charge because more than 180 days had elapsed since the date the Commission assumed jurisdiction over the charge, the Commissioner had not filed suit, and Plaintiff had requested the notice through her attorney.[8]  [Doc. 1-1 at 5].

Plaintiff, along with McGruder and three others, filed suit on December 30, 2010.[9]  [Doc. 1].  Plaintiff Rossi raises claims in all six counts. (*See* Am. Compl., *passim*).  She alleges in Count One that Defendant violated the ADA when it subjected Plaintiff "to unwelcome harassment based on her disability when she was forced by her superior to explain her condition to him and his subordinate." (*Id*. ¶ 189).  She alleges in Count Two that Defendant violated the ADEA when its management denied her tools to do her job; ignored her; sent "humiliating and

---

[8]     Although the format of Plaintiff's EEOC charge of discrimination is very similar to that of the other plaintiffs in this case, [*see* Doc. 1-1, *passim*], she states that she was not represented by counsel and does not remember having spoken to the other plaintiffs at the time she filed her EEOC charge, (*see* Pl. Dep. at 30-31).

[9]     On March 21, 2011, the Court granted leave to add a sixth plaintiff. [Doc. 10].

18

embarrassing" e-mails; forced her to explain the reasons for her FMLA leave to her supervisor and his subordinate; and was abusive and recommended termination when she spoke at departmental meetings. (*Id*. ¶ 197). She contends that "[y]ounger employees were not treated in this way." (*Id*). She alleges in Count Three that Defendant committed gender discrimination in violation of Title VII when, unlike male employees, Plaintiff was "denied tools and privileges of employment"; "sent humiliating and embarrassing emails"; "embarrassed at meetings"; threatened with termination for speaking at a meeting; denied pay increases; refused permission to take a regional exam, then assigned a seat once she did receive permission. (*Id*. ¶ 209). Plaintiff alleges in Count Four that Defendant committed race discrimination in violation of Title VII when, unlike black employees, Plaintiff was "denied tools and privileges of employment"; ignored; "sent humiliating and embarrassing emails"; required to disclose information about her medical condition to a manager and his subordinate; "suffered abuse at meetings by Defendant's management"; was threatened with termination for speaking at a meeting; denied pay increases; refused permission to take a regional exam, then assigned a seat once she did receive permission. (*Id*. ¶ 220). She alleges in Count Five that after she "complained that white and female employees were treated less favorably than males," filed a grievance, a police report,

and an EEOC charge, Defendant retaliated against her in violation of Title VII when it "embarrassed, harassed and humiliated" her; ignored her; forced her to explain her medical condition; recommended her for termination; took away responsibilities; "had a male stalk/follow [her]"; wrote her up for insubordination; transferred her; falsely represented her start date to affect her vacation time; refused to increase her pay; refused to grant her permission to take a regional exam and assigned her a seat once she did receive permission. (*Id.* ¶¶ 225, 230). She alleges in Count Six that Defendant violated the FMLA when it harassed her and treated her "abusively" for taking FMLA leave; refused to grant her permission to take a regional exam; and assigned her a seat once she did receive permission to take the exam; "berated" her during meetings; and disciplined her. (*Id.* ¶ 239). Defendant moves for summary judgment on all of Plaintiff's claims. [Doc. 158].

## II.    *Standard of Review*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*,

AO 72A
(Rev.8/8
2)

232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. If the record does not blatantly contradict the nonmovant's version of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL, Inc. v. USA Fed.*

21

*Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999). "If the record presents disputed issues of material fact, the Court may not decide them; rather, it must deny the motion and proceed to trial." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001)).

### III.   *Legal Framework*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee for her participation in certain statutorily protected activities:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see also Biniashvili v. Bohne*, 397 Fed. Appx. 597, 598-99 (11th Cir. Sept. 28, 2010).

22

AO 72A
(Rev.8/8
2)

The ADEA likewise makes it unlawful for an employer, *inter alia*, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also prohibits discrimination against any employee because she "has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

The FMLA allows covered employees "to take up to twelve weeks of leave in a twelve-month period for the birth or adoption of a child, or the 'serious health condition' of the employee or the employee's child, spouse, or parent." *Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1305-06 (11th Cir. 2001) (quoting 29 U.S.C. § 2612(a)(1)). It also "prohibits an employer from interfering with an employee's attempt to exercise his leave right or retaliating against an employee for opposing practices made unlawful under the FMLA." *Id.* (citing 29 U.S.C. § 2615).

The ADA prohibits covered employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

23

compensation, job training, and other terms, conditions, and privileges of employment."

42 U.S.C. § 12112(a). Retaliation against a person claiming a right under the ADA or

opposing a practice made unlawful by the ADA is also prohibited. 42 U.S.C. § 12203.

Although the ADA does not expressly prohibit disability-based harassment, and the

Eleventh Circuit Court of Appeals has not yet decided the issue, the Circuit has

analyzed hostile work environment claims under the ADA under the presumption that

they are cognizable. *See Wolfe v. Postmaster Gen.*, 488 Fed. Appx. 465, 469 (11th Cir.

Aug. 31, 3012).

The same general principles governing the order and allocation of proof in cases

arising under Title VII apply to claims arising under the ADEA, the FMLA, and the

ADA as well. *Smith*, 273 F.3d at 1314 (FMLA); *Walker v. NationsBank of Fla. N.A.*,

53 F.3d 1548, 1556 (11th Cir. 1995) (ADEA); *Vaughn v. NationsBank Corp.*,

137 F. Supp. 2d 1317, 1322 (N.D. Ga. 2000) (Pannell, J.) (ADA). A plaintiff asserting

a discrimination claim can support her claim either by direct or circumstantial evidence.

*EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). If direct

evidence of intentional discrimination does not exist or is insufficient, a plaintiff may

offer circumstantial evidence, using the framework established in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973). *Lawver v. Hillcrest Hospice, Inc.*,

24

300 Fed. Appx. 768, 772 (11th Cir. Nov. 24, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)).

> This framework requires the plaintiff to establish a *prima facie* case of discrimination, and then the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employment action it took. The burden then shifts back to the plaintiff to demonstrate that the proffered reason was pretextual. The plaintiff can establish pretext by showing that the employer's non-discriminatory reason should not be believed, or, when considering all the evidence, that it is more likely that the discriminatory reasons motivated the decision than the employer's proffered reasons.

*Lawver*, 300 Fed. Appx. at 772 (citations omitted).

"The methods of presenting a prima facie case are flexible and depend on the particular situation." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). Generally speaking, to satisfy a *prima facie* case for a disparate-treatment claim based on circumstantial evidence, a plaintiff must show: " '(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job.' " *Brown v. Jacobs Eng'g, Inc.*, 401 Fed. Appx. 478, 479-80 (11th Cir. Oct. 28, 2010) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

25

AO 72A
(Rev.8/8
2)

Regarding pretext,

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason.

*Alvarez*, 610 F.3d at 1265-66 (alteration in original) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotation marks omitted)). To avoid summary judgment, a plaintiff " 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.' " *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)). In other words, a plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

AO 72A
(Rev.8/8
2)

## IV.  Discussion

As an initial matter, the Court notes that in her response to Defendant's motion for summary judgment, Plaintiff narrowed her claims somewhat.  She states that although she believes that she suffered discriminatory failure to promote in 2007, she is not pursuing such a claim in this lawsuit.  [Doc. 204-1 at 2].  She also clarifies that (1) she brings only a retaliation claim—and not a disparate-treatment claim—based on her transfer from the downtown Atlanta office to the Alpharetta office, [*id*. at 10-11], (D ¶ 122; P. Resp. ¶ 122); (2) she does not bring an ADA claim for failure to provide proper accommodation, (D ¶¶ 82-86; P. Resp. ¶¶ 82-86); and (3) she does not raise any claims based on failure to receive cost-of-living increases, (D ¶ 122; P. Resp. ¶ 122).  The undersigned therefore considers Plaintiff's transfer only in the context of a retaliation claim, and to the extent the complaint raises claims arising from a 2007 failure to promote, an ADA claim for failure to provide proper accommodation, or any claim arising from failure to receive cost-of-living increases, the undersigned **RECOMMENDS** to the District Judge that he **DEEM** those claims **ABANDONED**.

The undersigned now turns to Defendant's motion for summary judgment on Plaintiff's remaining claims.  Defendant moves for summary judgment on all of Plaintiff's disparate-treatment claims arising from age, race, or gender discrimination

27

AO 72A
(Rev.8/8
2)

on the grounds that Plaintiff cannot establish a *prima facie* case of discrimination. [Doc. 158-1 at 6]. Specifically, Defendant argues that there is no evidence that Plaintiff was subjected to an adverse employment action or that someone who was outside Plaintiff's protected race or gender class or who was substantially younger than Plaintiff was treated more favorably. [*Id*. at 8-15, 17-22]. It further contends that any failure-to-promote claims Plaintiff may intend to raise based on Gardner's and Hooker's selection for positions she applied for in 2010 are barred as a matter of law because she did not include them in her EEOC charge and therefore failed to exhaust her administrative remedies. [*Id*. at 15-17]. It also proffers nondiscriminatory reasons for the promotion decisions and argues that Plaintiff cannot show they are pretextual. [*Id*. at 22-24]. With regard to Plaintiff's retaliation claims, Defendant contends that Plaintiff did not suffer a materially adverse action and argues that she did not engage in protected activity until after Defendant's allegedly discriminatory conduct took place and Plaintiff therefore cannot prove causation. [*Id*. at 24-31]. As to the ADA claim, Defendant argues that Plaintiff is unable to show that she was subjected to unwelcome harassment because of her disability because she cannot establish causation. [*Id*. at 32-34]. Finally, Defendant contends that its motion for summary judgment on Plaintiff's

28

AO 72A (Rev.8/8 2)

FMLA claims should be granted because Plaintiff admits that Defendant never denied her requests for FMLA leave.  [*Id*. at 34-35].

Defendant's arguments and Plaintiff's responses are discussed in detail below. The Court first addresses the arguments regarding Plaintiff's ADA and FMLA claims. It then addresses the claims Plaintiff raises under Title VII and the ADEA.

### A. ADA

Plaintiff claims that she was subjected "to unwelcome harassment based on her disability when she was forced by her superior to explain her condition to him and his subordinate." (Am. Compl. ¶ 189).  She contends that this conduct violated the ADA.

"In order to establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) [s]he is disabled; (2) [s]he was a 'qualified individual' at the relevant time, meaning that [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against because of h[er] disability." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).  The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded

29

as having such an impairment." 42 U.S.C. § 12102(1); *Chapman v. U.S. Postal Serv.*, 442 Fed. Appx. 480, 484 (11th Cir. Oct. 4, 2011).

Presuming that the ADA provides for a cause of action for hostile work environment, to establish a *prima facie* case of such discrimination, the plaintiff must show:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment . . . ; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Wolfe*, 488 Fed. Appx. at 469 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotation marks omitted)).

In its motion for summary judgment, Defendant notes that Plaintiff alleges that she was subjected to unwelcome harassment because of her disability when she was forced to explain to George in front of a subordinate why she needed time off for doctor's appointments and when George made a comment about "institutionalized behavior" during the October 2008 departmental meeting. [Doc. 158-1 at 33]. It argues that the Court should grant summary judgment on the claim because Plaintiff "is unable to show that she was subjected to discrimination **because** of her disability."

AO 72A
(Rev.8/8
2)

[*Id*. (emphasis in original)].  It states that both George and Dennis deny that the event took place and that "both Davis and Augustine recall Plaintiff's disruptive behavior." [*Id*.].

Plaintiff, in response, points out that she was diagnosed as bipolar in 2001 and since then has seen mental health providers for treatment in connection with the diagnosis, including in-facility treatment, medication, group therapy, and weekly psychotherapy sessions.  [Doc. 204-1 at 16 (citing D ¶ 65)]; (*see also* D ¶¶ 63-64, 66). She states that she was required to ask George for leave to attend therapy and he then required her to disclose her condition to him in front of Dennis, his subordinate, in order to be granted leave to attend the therapy.  (P ¶¶ 35-37, 39; D. Resp. ¶¶ 35-37, 39; D ¶ 72; Pl. Resp. ¶ 72; Pl. Dep. 70-71, 78-79, 152; Pl. Aff. ¶¶ 20-24, 26).  Plaintiff testifies that approximately two months later, after Plaintiff had an altercation with George during a departmental meeting and was leaving the room, George proclaimed, "There goes an example of institutionalized behavior."  (P ¶ 41; D. Resp. ¶ 41; Pl. Dep. 78-79; Pl. Aff. ¶ 26).  She also refers the Court to *Farley v. Nationwide Mutual Insurance Company*, 197 F.3d 1322, 1327 (11th Cir. 1999), a case in which a jury delivered a verdict in favor of a plaintiff with long-term mental disabilities who was

31

subject to disability-related jokes and was the subject of a cartoon placed on a company bulletin board. [Doc. 204-1 at 17].

In reply, Defendant states that "[t]he only evidence of disability discrimination offered by [Plaintiff] is her own speculation and conjecture." [Doc. 224 at 23]. It states that Plaintiff's account of the comment she says George made at the meeting is uncorroborated by anyone at the meeting and that her account of being forced to disclose the details of her medical condition to George and his subordinate is also uncorroborated. [*Id.*]. It argues that "[w]ithout more, [Plaintiff's] self-serving conjecture and speculation is insufficient to survive summary judgment as a matter of law." [*Id.*].

Defendant's argument misses the mark. The Court finds it questionable whether the employer conduct Plaintiff alleges is sufficiently severe and pervasive to constitute a hostile work environment. However, Defendant does not argue in its motion for summary judgment that Plaintiff has failed to make a sufficient showing regarding employer conduct—instead it argues that Plaintiff has failed to proffer evidence sufficient to establish a genuine issue of material fact as to *causation*. [*See* Doc. 158-1 at 33; Doc. 224 at 23].

AO 72A
(Rev.8/8
2)

Here, Plaintiff presents sworn testimony showing that she had a diagnosis of bipolar disorder, that she requested leave so that she could seek treatment for the disorder, that she was required by George to disclose her disability in front of George's subordinate before he would grant the leave, and that only two months later, in the context of having a disagreement with Plaintiff during a departmental meeting, announced, "There goes an example of institutionalized behavior," which could reasonably be inferred to refer to Plaintiff's bipolar disorder. The Court notes that although Defendant alleges that George and Dennis deny that the disclosure "event" took place, Defendant finds no such denials by George or Dennis in Defendant's statement of material facts. It also bears noting that even if true, the fact that "both Davis and Augustine recall Plaintiff's disruptive behavior," does not contradict Plaintiff's assertion that George made the "institutionalized behavior" comment in the departmental meeting.

Moreover, the Court is unmoved by Defendant's argument that the Court should disregard Plaintiff's "self-serving" testimony. It has pointed to no inconsistencies between Plaintiff's deposition and her affidavit that could show that the affidavit

33

AO 72A
(Rev.8/8
2)

testimony is a sham, and it points to no legal authority indicating that Plaintiff may not testify on her own behalf.[10]

For all of these reasons, the undersigned finds that Plaintiff has established a genuine issue of material fact as to the causation element of her ADA claim—the only element of her ADA claim that Defendant challenges. As a result, the undersigned **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment on the claim.

### B.    FMLA

Plaintiff claims that she suffered interference and retaliation under the FMLA when Defendant harassed her and treated her "abusively" for taking FMLA leave; refused to grant her permission to take a regional exam and assigned her a seat once she

---

[10]    In fact, given the well-established rule that on summary judgment the non-movant's version of disputed facts are accepted as true, *see Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n. 9 (11th Cir. 2002) (stating that a court must accept the non-movant's version of disputed facts as true for purposes of summary judgment); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1556 (11th Cir. 1987) (same); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983); *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir. Unit B Mar. 11, 1982) (same); *Aulds v. Foster*, 484 F.2d 945, 946 (5th Cir. 1973); *Pennsylvania v. Curtiss Natl. Bank*, 427 F.2d 395, 401 (5th Cir. 1970) (same), Defendant's argument that the Court should disregard Plaintiff's testimony because Defendant's witnesses deny that the remarks were made, is so frivolous as to amount to being asserted in bad faith, thus exposing the lawyers who made such arguments to sanctions.

AO 72A
(Rev.8/8
2)

did receive permission; "berated" her during meetings; and disciplined her. (Am. Compl. ¶¶ 236, 239). Plaintiff also alleges that George's requirement that Plaintiff disclose her condition to him and his subordinate before he would grant her leave and his announcement about "institutionalized behavior" in a departmental meeting also violated the FMLA, (P. Resp. ¶ 140), and she contends that Darlene Davis violated the FMLA when she stopped giving Plaintiff her FMLA paperwork and asked her to cancel her ADA, (D ¶ 142; P. Resp. ¶ 142).

As previously noted, a plaintiff may bring two types of claims under the FMLA: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, . . . , and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act . . . ." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citations omitted); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting *Strickland*, 239 F.3d at 1206). To state a claim for interference with a substantive right under the FMLA, the plaintiff "need only demonstrate by a preponderance of the evidence that [she] was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206-07. "Interfering with" the exercise of FMLA

35

rights includes both "refusing to authorize FMLA leave . . . [and] discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). When bringing an interference claim, "[t]he employee need not allege that [her] employer intended to deny the benefit—the employer's motives are irrelevant." *Hurlbert*, 439 F.3d at 1293. Conversely, to state a claim for retaliation under the FMLA, the plaintiff "must demonstrate that his employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right"; in other words, the plaintiff shoulders the increased burden of showing that the defendant's actions "were motivated by an impermissible or discriminatory animus." *Strickland*, 239 F.3d at 1207 (internal quotation marks omitted).

Defendant moves for summary judgment on Plaintiff's FMLA claims based on Plaintiff's admissions that her FMLA paperwork was processed when Plaintiff requested leave in 2008 and that Defendant allowed her to take FMLA leave at that time and every time since. [Doc. 158-1 at 34 (referring to D ¶¶ 141, 143; P. Resp. ¶¶ 140, 143)]. In response, Plaintiff argues that George's requirement that she disclose her condition to him and his subordinate before he would approve the leave interfered with her right to take the leave "free of discrimination and interference." [Doc. 204-1 at 19]. She also points out that while Defendant provided several legal

propositions regarding the FMLA, it did not present any argument regarding Plaintiff's retaliation claim. [*Id*. at 18]. She further asserts that she can establish a *prima facie* case of retaliation. [*Id*. at 20-21].

### a. Retaliation

A *prima facie* case of retaliation under the FMLA requires a showing that "(1) the employee engaged in statutorily protected conduct," (2) she suffered a materially adverse action, and "(3) there is a causal connection between the two."[11] *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010). The plaintiff may satisfy the causal-relation element by showing that "the protected activity and adverse

---

[11] In *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008), the Eleventh Circuit recognized that the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), broadened the type of employer conduct considered actionable in a retaliation claim, from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related. *Crawford*, 529 F.3d at 973. Therefore, as result of *Burlington Northern* and *Crawford*, the Court concludes that it is inappropriate to refer to this element as the adverse employment action element. *Burlington Northern* explicitly states that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern*, 548 U.S. at 67. The Court's decision merely requires the employee to show that a reasonable employee would have found the challenged action materially adverse, meaning the reasonable worker would be dissuaded from making or supporting a charge of discrimination. *Id*. at 68 (quotation marks and citations omitted). Thus, it is more appropriate to refer to the "adverse employment action" element as the "materially adverse action" element.

AO 72A
(Rev.8/8
2)

action were 'not wholly unrelated.' " *Id.* Although an inference of causation can be established by showing close temporal proximity between the statutorily protected activity and the adverse employment action, if there is no other evidence of causation, the temporal proximity must be very close. *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that a three-month disparity was insufficiently close). Additionally, in a retaliation case, "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Id.*

Like Plaintiff's ADA claim, it appears that Plaintiff will be unable to prove that Defendant's conduct was sufficiently adverse to support her FMLA retaliation claim. Defendant, however, has failed to put forth any argument supporting its motion for summary judgment on Plaintiff's FMLA retaliation claim. [*See* Doc. 158-1 at 34-36]. As noted above, on a motion for summary judgment, the moving party carries the initial burden of "informing the court of the basis for its motion." *Rice-Lamar*, 232 F.3d at 840 (further providing that the moving party also carries the initial burden of "identifying those materials that demonstrate the absence of a genuine issue of material fact"); *see also* N.D. Ga. R. 7.1A(1) (providing that "[e]very motion presented to the

38

clerk for filing shall be accompanied by a memorandum of law which cites supporting authority").

Because Defendant has proffered no grounds for its motion for summary judgment, the undersigned finds that it has not met the initial burden it must bear on such a motion. The undersigned therefore **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment—to the extent that Defendant has asserted such a motion on this claim—on its contention that Plaintiff cannot raise a genuine issue of material fact as to each element of her FMLA retaliation claim.

### 2. *Interference*

In contrast, Defendant's argument regarding Plaintiff's interference claim—cursory as it is—is well-taken. By pointing out that Plaintiff was never actually denied any FMLA leave she requested, it appears that Defendant is suggesting that Plaintiff was not denied a substantive right and therefore cannot raise an interference claim. [*See* Doc. 158-1 at 34].

Plaintiff, in response, does not provide an analogous case wherein a plaintiff who may have been discouraged in some way from requesting FMLA leave nevertheless prevailed on a claim when the employer then granted all the leave requested. [*See* Doc. 204-1 at 19]. Instead, she points the Court to 29 U.S.C. § 2615(a)(1), which provides

39

that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

It appears, however, that to bring a successful FMLA interference claim, a plaintiff must be able to show that she suffered some sort of prejudice as a result of the interference. In *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81 (2002), the United States Supreme Court determined that a Department of Labor regulation was invalid because it "alter[ed] the FMLA's cause of action in a fundamental way . . . [by] reliev[ing] employees of the burden of proving any real impairment of the rights and resulting prejudice." *Ragsdale*, 535 U.S. at 90; *Delise v. Metro-North R.R. Co.*, 646 F. Supp. 2d 288, 290 (D. Conn. 2009). The Court then explained that 29 U.S.C. § 2617, the FMLA's enforcement provision, "provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). The remedy is tailored to the harm suffered." *Ragsdale*, 535 U.S. at 89; *Delise*, 646 F. Supp. 2d at 290; *see also Demers v. Adams Homes of Nw. Fla., Inc*., 321 Fed. Appx. 847, 849 (11th Cir. Mar. 20, 2009)

(citing *Ragsdale*, 535 U.S. at 89 ("The FMLA's '§ 2617 provides no relief unless the employee has been prejudiced by the violation' in some way.")).

Here, Plaintiff argues that when George required her to disclose her disabling condition in front of his subordinate as a prerequisite to approving the FMLA leave Plaintiff was requesting so that she could receive treatment for the condition, Defendant impermissibly burdened the exercise of her right to FMLA leave. [Doc. 204-1 at 19]. It is undisputed, however, that Plaintiff has received all of the FMLA leave she has requested. Consequently, Plaintiff cannot show that she suffered any prejudice as a result of Defendant's interference with her FMLA rights.

Accordingly, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** Defendant's motion for summary judgment on Plaintiff's FMLA interference claim.

### C.      *Title VII and ADEA Claims*

Defendant moves for summary judgment on all of Plaintiff's claims on the grounds that Plaintiff cannot establish a *prima facie* case of age, race, or gender discrimination or retaliation. [Doc. 158-1 at 5]. Specifically, Defendant argues that there is no evidence the Plaintiff was subjected to an adverse employment action or that a similarly situated person outside of her protected class was treated more favorably.

41

AO 72A
(Rev.8/8
2)

[*Id*. at 6-15, 18-22]. It further contends that any failure-to-promote claims Plaintiff may intend to raise are barred as a matter of law because she did not include them in her EEOC charge and therefore failed to exhaust her administrative remedies, [*id*. at 15-17], and also fail because the selected candidates were not "substantially younger," [*id*. at 18-20], and because Defendant had legitimate nondiscriminatory reasons for appointing the Senior Appraisers it selected, [*id*. at 22-24]. Finally, Defendant argues that Plaintiff's retaliation claim fails because she did not engage in protected activity until after Defendant's allegedly discriminatory conduct took place. [*Id*. at 24-25].

Plaintiff, in response, clarifies that she does not contend that her transfer to the Alpharetta office was because of her age, race, or gender, but rather that she was reassigned to that office in retaliation for engaging in statutorily protected activity. [Doc. 204-1 at 10-11]. She argues that she engaged in statutorily protected activity when she "complained to Mr. George that tools were being provided to employees in a discriminatory fashion." [*Id*. at 11]. She contends that she suffered material adverse actions when, as a result of her activity, George began to ignore her, began to "habitually embarrass her," and wanted her written up or fired, all while treating male employees with respect; unjustifiably forced her to disclose personal medical information to him and a subordinate and then disclosed the information at a staff

AO 72A
(Rev.8/8
2)

meeting; took away part of Plaintiff's responsibilities; hired an old friend who engaged in "stalking-like behavior" and wrote Plaintiff up after she complained; and transferred her to the Alpharetta office in a switch with another older, white female employee who had also complained about unequal treatment. [*Id*. at 11-12]. As proof that Defendant engaged in the accused conduct as a result of Plaintiff's activity, she urges the Court to find a "pattern of worsening treatment [Plaintiff] suffered after complaining about discrimination." [Doc. 204-1 at 12].

Plaintiff further contends that she raises a *prima facie* case of discriminatory failure to promote and that although her charge of discrimination did not contain an allegation regarding discriminatory failure to promote, her claims should nevertheless be considered because they could have reasonably "grown out of" the allegations Plaintiff did raise in the charge. [Doc. 204-1 at 8-10]. Plaintiff also alleges that she was discriminated against as to the "terms, conditions, and privileges of her employment" when younger black employees were given new appraisal books, calculators, and cameras with video capability but Plaintiff was denied those tools. [Doc. 204-1 at 6-8].

Defendant's arguments and Plaintiff's responses are discussed in further detail below. The Court first considers the arguments regarding exhaustion of administrative

43

remedies, then addresses the retaliation claims, and finally turns to the claims of disparate treatment.

### 1.  Exhaustion of Failure-to-Promote Claims

Putting aside the question of whether Plaintiff has adequately stated a failure-to-promote claim in the amended complaint, Defendant moves for summary judgment on any such claim Plaintiff may have intended to raise, arguing that she did not exhaust her administrative remedies, cannot show facts sufficient to establish a genuine issue of material fact as to her *prima facie* case, and cannot overcome its reasons for selecting other candidates for the Senior Appraiser positions Plaintiff desired.  The Court agrees that Plaintiff did not exhaust her administrative remedies and therefore may not pursue a claim for discriminatory failure to promote.

Before bringing a Title VII or ADEA claim in court, a plaintiff must first exhaust her administrative remedies by raising her allegations in a charge of discrimination filed with the EEOC.  *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (Title VII); *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1238 (11th Cir. 2004) (ADEA); *see also Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (noting that the purpose of this exhaustion requirement is to allow the EEOC to have "the first opportunity to investigate the alleged discriminatory practices to permit it to

44

perform its role in obtaining voluntary compliance and promoting conciliation efforts"). Administrative exhaustion consists of two elements: timeliness and disclosure of the basis for the charge. *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d). Defendant's motion for summary judgment questions the second element—the disclosure of the basis for the charge. [Doc. 158-1 at 15-17].

Title VII and the ADEA prohibit a plaintiff from alleging new acts of discrimination in the judicial complaint that were not raised in the EEOC charge. *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005); *Gregory*, 355 F.3d at 1279-80. On the other hand, a plaintiff may bring claims that "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint. *Gregory*, 355 F.3d at 1279 (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)); *see also Parisi*, 400 F.3d at 585 (A plaintiff may bring suit on allegations raised in her EEOC charge, "along with allegations that are 'like or reasonably related' to that claim."). Accordingly, "the proper inquiry" is whether the "complaint was like or related to, or grew out of, the allegations contained in her EEOC charge." *Gregory*, 355 F.3d.at 1280; *see also Parisi*, 400 F.3d at 585 ("The claims of employment discrimination in the complaint may be as broad as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge."). "Courts are nonetheless

AO 72A
(Rev.8/8
2)

'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII],' " such that the EEOC charge is not to be "strictly interpreted." *Gregory*, 355 F.3d at 1280 (quoting *Sanchez*, 431 F.2d at 460-61, 465).

Plaintiff does not contend that her EEOC charge identifies any claims for discriminatory failure to promote. [*See* Doc. 204-1 at 8-9]. She argues, however, that the Court should accept her discriminatory failure-to-promote claims because they could be "reasonably expected to grow out of [Plaintiff's] initial Charge that included allegations of gender, race and age discrimination." [*Id*. at 9]. She also suggests that there is a circuit split on the question of "whether a post-charge discriminatory event requires the filing of an additional EEOC Charge." [*Id*. (citing *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673 (8th Cir. 2006))]. The split the Eighth Circuit recognized in *Wedow* was between circuits such as the Tenth, which requires "a new or amended EEOC charge for each subsequent alleged incident of retaliation or discrimination, regardless of whether the subsequent acts are related to the allegations of the initial timely filed EEOC charge," and circuits such as the Sixth and Eighth, which operate under the theory that "reasonably related subsequent acts may be considered exhausted." *Wedow*, 442 F.3d at 673 (comparing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1238 (10th Cir. 2004), to *Delisle v. Brimfield Township Police Dep't*,

46

94 Fed. Appx. 247, 252-54 (6th Cir. Mar. 8, 2004), and *Parisi*, 400 F.3d at 585-86).

The more-lenient Sixth and Eighth Circuit theories—which the Court presumes

Plaintiff wishes to urge the Court to adopt—appear to be in line with the Eleventh

Circuit standard recited above. Additionally, the Court recognizes that the former

Fifth Circuit has held "that it is unnecessary for a plaintiff to exhaust administrative

remedies prior to urging a retaliation claim growing out of an earlier charge." *Gupta*

*v. E. Tex. State. Univ.*, 654 F.2d 411, 414 (5th Cir. Aug. 28, 1981).[12]

In the judicial complaint, although several of her co-plaintiffs raise specific

claims for failure to promote, Plaintiff only very generally alleges that "Plaintiffs

were . . . denied promotions . . . based on their gender," (Am. Compl. ¶ 215); "[a]fter

Tony George arrived all the promotions seemed to go to young males," (*id*. ¶ 120); and

"[y]ounger employees . . . received more promotions . . . despite less experience,"

(*id*. ¶ 200). Because the claims rest on allegations of class-based preferences rather

than retaliation for protected activity, it is clear that to the extent Plaintiff does raise

failure-to-promote claims, they are based on allegations of disparate treatment and not

retaliation. *See Standard*, 161 F.3d at 1333 (A plaintiff establishes a *prima facie* case

---

[12]        In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)
(en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the
former Fifth Circuit handed down prior to the close of business on September 30, 1981.

47

AO 72A
(Rev.8/8
2)

for racially discriminatory failure to promote by showing that "(1) [s]he was in a protected group; (2) [s]he was not given the promotion; (3) [s]he was qualified for the position and (4) someone outside of the protected group was given the position."). In her response to Defendant's motion for summary judgment, Plaintiff defends the claim solely as a disparate-treatment claim, pointing to two specific instances where younger black males were promoted instead of her. [Doc. 204-1 at 8-10].

The failure-to-promote claim is not "like or related to" the allegations in Plaintiff's EEOC charge. In her charge of discrimination, which spans three single-spaced typewritten pages, Plaintiff complains at length about her transfer to the Alpharetta office; George's preferential treatment of younger black employees with regard to work tools such as calculators, cameras, and appraisal books; George's dismissive and humiliating treatment of Plaintiff in the office and at meetings; George's requirement that Plaintiff disclose her medical condition to him in front of his assistant; George's recommendation that Plaintiff be terminated; Manning's request that she discontinue her grievance against George; removal of the 2008 property valuation appeals from Plaintiff's workload; the incident in the parking lot with Allen; the manner of Defendant's subsequent investigation, decision to change Plaintiff's work hours, and decision not to fire Allen; her dispute about her start date, and as a result,

AO 72A
(Rev.8/8
2)

about the vacation to which she may have been entitled; and her lack of pay increases. [Doc. 195-1 at 17-19]. Nowhere in the entire charge does Plaintiff hint that she had applied for promotions or even intended to, much less that she had been denied promotions. [*See id.*]. Indeed, she complains extensively about lacking resources to properly perform the Property Appraiser position she held. [*See id.*]. As a result, the Court finds that the failure-to-promote claims—to the extent that Plaintiff raises failure-to-promote claims in the amended complaint—would not have grown out of Plaintiff's lengthy and highly detailed charge of discrimination complaining exclusively about her treatment in her Property Appraiser position. Plaintiff also never amended or updated her September 2009 EEOC charge, so there was nothing that would have given the EEOC the opportunity to investigate failure-to-promote claims arising from activity taking place in 2010.

For these reasons, the undersigned **RECOMMENDS** to the District Judge that to the extent Plaintiff raised failure-to-promote claims under Title VII or the ADEA in the amended complaint that Defendant's motion for summary judgment on those claims be **GRANTED**.[13]

---

[13] The undersigned also notes that it is undisputed that Manning was the final decisionmaker with respect to all promotions and that he made the promotion decisions based on the recommendations of independent interview panels and his own

49

### 2.    Retaliation

Plaintiff claims that she was subjected to retaliation under Title VII. (Am. Compl. ¶ 225). Defendant moves for summary judgment on the retaliation claims

---

determinations as the merit and fitness of all the candidates. (D ¶¶ 93-95, 105-06; P. Resp. ¶¶ 93-95, 105-06). In response, Plaintiff testifies as to her own qualifications and experience and states that she had more experience than the candidates who were selected because she had experience as a "senior appraisal consultant" before joining the county in 2001, while Gardner and Hooker had joined the county as Data Collectors in 1994 and had been promoted to Residential Appraiser in 1995 and 1996, respectively. [Doc. 204-1 at 10 (referring to P ¶¶ 78-91)].

While promoting a less-qualified person is probative of discriminatory motive, Plaintiff cannot prove pretext simply by showing that she was more qualified than Gardner and Hooker. She must show that the decision was motivated by race, sex, or age. A plaintiff's subjective beliefs as to relative qualification between candidates do not satisfy a plaintiff's burden of establishing pretext. That is, a plaintiff "cannot prove pretext by asserting baldly that she was better qualified than the person who received the position at issue." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1090 (11th Cir. 2004); *see also Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (similar). Instead, for a plaintiff to satisfy pretext based on relative qualifications, the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) (quoted approvingly in *Ash*). Plaintiff has failed to meet this standard. Therefore, should the District Judge disagree with the undersigned's determination that Plaintiff's failure-to-promote claims are precluded based on her failure to exhaust her administrative remedies, the Court may, in the alternative, **GRANT** Defendant's motion for summary judgment on Plaintiff's failure-to-promote claims based on Defendant's showing that it had legitimate nondiscriminatory reasons for selecting other candidates for the positions Plaintiff desired.

AO 72A
(Rev.8/8
2)

on the grounds that Plaintiff cannot establish any element of a *prima facie* case of retaliation. [Doc. 158-1 at 24-31; *see also* Doc. 204-1 at 11].

To establish a *prima facie* case for a retaliation claim, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action[14]; and (3) there was a causal link between the two. *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 856 (11th Cir. 2010); *see also Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). To satisfy the first element, a plaintiff need not prove the underlying claim of discrimination that led to her protected activity; it is sufficient if she had "a reasonable good faith belief that the discrimination existed." *Holifield*, 115 F.3d at 1566; *see also Standard*, 161 F.3d at 1328 ("[I]t is sufficient that an employee have a good faith, objectively reasonable belief that [her] activity is protected by the statute."). As for the second element, a materially adverse action is one that " 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Reeves v. DSI Sec. Servs., Inc.*, 395 Fed. Appx. 544, 547 (11th Cir.

---

[14]  As discussed in n.11 *supra*, because *Burlington Northern* and *Crawford* broadened the type of employer conduct considered actionable in a retaliation claim, the Court finds it more appropriate to refer to the "adverse employment action" element of a retaliation claim as the "materially adverse action" element. *See Crawford*, 529 F.3d at 973-74; *Burlington Northern*, 548 U.S. at 67.

AO 72A
(Rev.8/8
2)

Aug. 31, 2010) (quoting *Burlington Northern*, 548 U.S. at 68). " '[P]etty slights, minor annoyances, and simple lack of good manners' generally do not rise to the level of materially adverse actions." *Reeves*, 395 Fed. Appx. at 547 (quoting *Burlington Northern*, 548 U.S. at 68). To satisfy the third prong, Plaintiff is only required to show that the "protected activity and the adverse action were not wholly unrelated." *Shotz v. City of Plantation*, 344 F.3d 1161, 1180, n.30 (11ᵗʰ Cir. 2003) ("[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse action.") (alteration and citation omitted); *see also Shotz*, 344 F.3d at 1180 n.30 (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11ᵗʰ Cir. 1998) (one month between protected activity and adverse action supports finding of causation)).

Plaintiff contends that she first engaged in protected activity in 2007 when she complained to George that work tools were being provided to employees in a discriminatory fashion and that she suffered continuing discriminatory conduct culminating in the 2009 transfer. [Doc. 204-1 at 11-15]. Accepting that Plaintiff did complain about discriminatory distribution of tools, and presuming that her complaint led to all of the activity of which she complains, Plaintiff's retaliation claim

52

AO 72A (Rev.8/8 2)

nevertheless fails because she cannot establish that she engaged in statutorily protected conduct.

The undersigned finds that Plaintiff has not presented evidence sufficient to enable a reasonable factfinder to determine that she held an objectively reasonable good-faith belief that she was engaging in statutorily protected activity when she complained about the unequal distribution of tools. To show that she held such an objectively reasonable good-faith belief, Plaintiff must show that the unequal distribution of tools was unlawful according to substantive law existing at the time. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). "Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit Court of Appeals] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008).

In an attempt to show that Plaintiff's complaint about unequal distribution of tools amounts to an adverse employment action and that she therefore held a reasonable good faith belief that she was opposing employer conduct proscribed under Title VII, Plaintiff argues that the unequal distribution of tools amounted to impermissible

53

AO 72A
(Rev.8/8
2)

discriminatory denial of a benefit or "privilege of employment" under Title VII as established in *Hishon v. King & Spalding*, 467 U.S. 69 (1984).[15] [Doc. 204-1 at 6-8]. It is clear that this was not the case.

The Eleventh Circuit Court of Appeals has explained the law on adverse employment actions as follows:

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling: the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

---

[15]   Plaintiff also states—correctly—that the Supreme Court has held that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment of men and women in employment' " and therefore is not limited to "economic" or "tangible" discrimination. [Doc. 204-1 at 7 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986))]. At issue in *Meritor* was whether, lacking a showing of economic damage, sexual harassment could be actionable under Title VII. *Id*. at 62. The Court determined that it could, so long as the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. at 67. Because Plaintiff does not rely on *Meritor* to support a harassment claim, *Meritor* has, at most, limited application to the case at hand.

54

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).

*Hishon* provides a weak analogy to Plaintiff's claims in this case. The Plaintiff in *Hishon* was an associate attorney passed over for partnership in her law firm and consequently terminated. *Hishon*, 467 U.S. at 72. The Court determined that the plaintiff had adequately stated a Title VII claim for discriminatory denial of privileges of employment based on allegations that "would support the conclusion that the opportunity to become a partner was part and parcel of an associate's status as an employee"—namely that the employer "used the prospect of ultimate partnership to induce young lawyers to join the firm" and that it was known among the associates that they "could regularly expect to be considered for partnership at the end of their 'apprenticeships.' " *Id.* at 76. To analogize *Hishon* to the case at hand, the Court would have to find that the promise of receiving certain work tools was a primary factor inducing employees to work for Defendant, such that it became "a term, condition, or privilege of . . . employment." *See id.* at 75-76.

The evidence Plaintiff presents would not enable a reasonable factfinder to find that receipt of certain tools or equipment was so central to her employment with Defendant. Although Plaintiff now contends that was denied a new appraisal book,

AO 72A
(Rev.8/8
2)

camera, memory card, and calculator, (P ¶¶ 19-21, 24), she admits that at the time of

her request, she already had an old camera, a calculator, and an old appraisal book, and

the only benefit she states that she would have received from new equipment is "video

capability" in her camera, (D ¶ 129; P. Resp. ¶ 129).[16]  Plaintiff also does not specify

what she said to George, what tools she complained about, or when or how she raised

the complaint.  (*See* P ¶ 28).  Finally, Plaintiff does not cite any cases in which a court

found that a plaintiff suffered an adverse employment action by not being "given"

certain tools she did not show that she needed.  As a result, the undersigned finds that

Plaintiff has failed to show that the unequal distribution of tools and equipment was an

adverse employment action and that she therefore held an objectively reasonable belief

that she was opposing conduct proscribed under Title VII.

     To rise to the level of an actionable Title VII claim, employment decisions must

work a material alteration on the terms of employment, as opposed to being merely

petty slights or trivial annoyances.  *See Davis*, 245 F.3d at 1239.  The asserted impact

"cannot be speculative and must at least have a tangible adverse effect on the plaintiff's

employment."  *Filius v. Potter*, 176 Fed. Appx. 8, 10 (11th Cir. Mar. 15, 2006).

---

[16]    Plaintiff in fact states that she desired a calculator with video capability.
(P. Resp. ¶ 129).  The Court presumes this was a scrivener's error.

"Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239. While the Court can certainly see that a reasonable person could find that much of the conduct about which Plaintiff complains was petty and annoying, the Court does not find that Plaintiff has presented evidence sufficient for a reasonable factfinder to determine that the conduct was a serious and material alteration to the terms of her employment.

For this reason, the undersigned finds that Plaintiff has failed to proffer evidence sufficient to enable a reasonable factfinder to determine that the activity she alleges forms the basis for her retaliation claims was statutorily protected conduct.[17] The

---

[17] Because she does not raise such arguments in her response to Defendant's motion for summary judgment, it appears that Plaintiff abandoned her earlier assertions that she suffered retaliatory conduct as a result of the grievance she filed against George in October 2008 or the police report she filed against Allen in June 2009. [*See* Doc. 204-1 at 10-15]. The Court notes that in any event, neither the grievance nor the police report constituted statutorily protected activity that may be vindicated under Title VII's anti-retaliation clause.

In her grievance against George, Plaintiff complained that "George was disrespectful and verbally abusive and made derogatory remarks pertaining to the manner in which I perform my job. He dismissed my attempt to make suggestions during a department meeting and displayed the same behavior towards my manager and co-workers during this meeting." (P ¶ 44; D. Resp. ¶ 44; D ¶ 145; P. Resp. ¶ 145; Pl.

Dep., Exh. 8 [Doc. 195-1 at 178]). Under the anti-retaliation clause of Title VII, it is an unlawful employment practice "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by *this subchapter*, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under *this subchapter*." 42 U.S.C. § 2000e-3(a) (emphasis added). The grievance against George contains no allegations of discrimination based on "race, color, religion, sex, or national origin"—the province of Title VII, 42 U.S.C. § 2000e-2(a)(1). (Pl. Dep., Exh. 8 [Doc. 195-1 at 178]). Consequently, the grievance may not form the basis of the Title VII retaliation claim.

The police report would also have been insufficient evidence that Plaintiff engaged in statutorily protected activity. In the report, Plaintiff stated that she suspected that she was being watched by Allen and that this "may be a form of retaliation for an earlier grievance that she filed prior to the suspect working for the county." (Pl. Dep., Exh. 10 [Doc. 195-1 at 183]). First, the face of the police report contains no allegations of discrimination based on race, color, religion, sex, or national origin, and second, Plaintiff's statement of material facts contain no description of the earlier grievance. Consequently, Plaintiff does not show evidence that she had a reasonable belief that she was engaging in activity protected under Title VII. Third, if she was referring to the October 2008 grievance—the only grievance she shows evidence of having filed—the Court has already found in the paragraph immediately above that the grievance was not a sufficient basis for a Title VII claim. The undersigned therefore finds that even had Plaintiff intended to rely on the police report as a basis for a retaliation claim, she has not presented evidence sufficient to raise a genuine issue of material fact as to whether she engaged in a statutorily protected activity when she filed the police report.

It also bears noting that the only employer conduct taking place after Plaintiff filed her EEOC charge is the alleged discriminatory failure to promote. As discussed above, however, the Amended Complaint contains no allegation that the failure to promote was retaliatory, and Plaintiff's response to Defendant's motion for summary judgment contains no indication that Plaintiff intended to raise such a claim. *See supra* Part IV.C.1. Moreover, even had Plaintiff raised such an argument in her response to

58

undersigned therefore **RECOMMENDS** to the District Judge that he **GRANT**
Defendant's motion for summary judgment on Plaintiff's Title VII retaliation claims.

### 3.     *Disparate Treatment*

Defendant also asserts that Plaintiff has not shown direct evidence of age or
gender discrimination and cannot proffer circumstantial evidence sufficient to state a
*prima facie* case of age or gender discrimination.  [Doc. 158-1 at 8-10].  As noted
above, to state a disparate-treatment claim under Title VII based on circumstantial
evidence, a plaintiff must show: " '(1) she is a member of a protected class; (2) she was
subjected to adverse employment action; (3) her employer treated similarly situated
employees outside her class more favorably; and (4) she was qualified to do the job.' "
*Brown*, 401 Fed. Appx. at 479-80 (quoting *Maniccia*, 171 F.3d at 1368).  Similarly, a
plaintiff establishes a *prima facie* case of age discrimination under the ADEA if she
shows: "(1) that she was a member of the protected group of persons between the ages

—————————————

Defendant's motion for summary judgment, Eleventh Circuit precedent precludes a
plaintiff from amending her pleadings via arguments raised in her summary judgment
brief.  *Hurlbert*, 439 F.3d at 1297 (concluding that after plaintiff proceeded through
discovery without seeking to amend complaint to raise new claim, plaintiff "was not
entitled to raise it in the midst of summary judgment"); *Gilmour v. Gates, McDonald
& Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint
through argument in a brief opposing summary judgment.").  Consequently, the
undersigned finds that Plaintiff has also failed to raise a genuine issue of material fact
as to any retaliation claim arising from her EEOC charge.

AO 72A
(Rev.8/8
2)

of forty and seventy; (2) that she was subject to adverse employment action; (3) that a substantially younger person filled the position that she sought or from which she was discharged; and (4) that she was qualified to do the job for which she was rejected." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (citations omitted)).

Defendant does not challenge Plaintiff's membership in a protected class or question whether she was qualified to do her job. [Doc. 158-1, *passim*]. It does, however, contend that Plaintiff has narrowed her disparate-treatment claims to claims that younger, male, and nonwhite employees received tools to perform their jobs and pay increases and she did not.[18] [*Id.* at 8]. Defendant then goes on to argue that Plaintiff's disparate-treatment claims fail because (1) the denial of new work tools was not an adverse employment action; (2) Plaintiff does not know whether her supervisor "made the requisite request for tools"; and (3) Plaintiff cannot show a similarly situated comparator who is substantially younger or male and who has received pay increases. [*Id.* at 8-10].

_____

[18]    Defendant also acknowledged Plaintiff's claims for discriminatory failure to promote, which the Court addressed above in Part IV.C.1.

60

Plaintiff, in response, contends that she was subjected to adverse employment actions when "younger, black employees were given tools in the form of appraisal books, HP calculators and cameras with video capability to do their job and [Plaintiff] was denied those tools." [Doc. 204-1 at 6]. She contends that this constituted denial of "privileges of employment," as proscribed in *Hishon*. [*Id.* at 7 (citing *Hishon*, 467 U.S. at 75-76)]. Plaintiff does not attempt to show that she experienced disparate treatment as to pay raises or any other conditions of her employment. [*See* Doc. 204-1, *passim*]. In reply, Defendant again argues that the unequal distribution of work tools was not sufficiently objectively serious or tangible to rise to the level of an "adverse employment action." [Doc. 224 at 12-14].

The undersigned has already described why, to succeed under *Hishon*, Plaintiff would need to show that receipt of the new work tools she desired was a primary factor inducing Plaintiff to work for Defendant, such that it became "a term, condition, or privilege of her employment." *See supra* Part IV.C.2.; *see also Davis*, 245 F.3d at 1239 (holding that to succeed in showing that an employer's conduct constituted an adverse employment action, the plaintiff must show evidence that would allow a reasonable objective factfinder to determine that the employer's conduct impacted the " 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way" and

AO 72A
(Rev.8/8
2)

caused "a *serious and material* change in the terms, conditions, or privileges of employment"). The Court has also found that Plaintiff has proffered no facts to show that receipt of the new work tools she desired was so central to her employment with Defendant. *See supra* Part IV.C.2.

For these reasons, the undersigned finds that Plaintiff failed to raise a genuine issue of material fact as to whether she experienced an adverse employment action. The undersigned therefore **RECOMMENDS** to the District Judge that he **GRANT** summary judgment to Defendant on the disparate-treatment claims Plaintiff raises under Title VII and the ADEA.

## V. *Conclusion*

For the reasons set forth above, the undersigned **RECOMMENDS** to the District Judge that he **DENY** Defendant's motion for summary judgment as to Plaintiff's claims under the ADA and her claims for retaliation under the FMLA and that he **GRANT** Defendant's motion for summary judgment as to all of Plaintiff's remaining claims. [Doc. 158].

A Report and Recommendation on the remaining pending summary-judgment motion will be forthcoming under separate cover.

AO 72A
(Rev.8/8
2)

**IT IS SO RECOMMENDED**, this the 11th day of February, 2013.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)